ENO COTTON MILLS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 24355, 31083.   Promulgated June 12, 1931.

*E. S. Parker, Jr., Esq.,* for the petitioner.
*Eugene Harpole, Esq.,* for the respondent.

OPINION.

SEAWELL: All errors assigned in the petitions were abandoned by the petitioner except the one relating to the deduction allowable on account of the exhaustion, wear and tear of depreciable assets. The assets in question are divided into two general classes, namely, buildings and machinery, and for the purpose of this opinion we will discuss each class separately.

With respect to buildings, no evidence was furnished as to the cost of the buildings acquired prior to 1917 other than that, as of December 31, 1916, the Commissioner determined a cost as shown by the petitioner's records in a certain amount and made an allocation of such amount as between brick and frame construction on the basis of 70 per cent and 30 per cent, respectively. Some of the assets were acquired prior to March 1, 1913, but no evidence was furnished as to their value on March 1, 1913. Evidence was submitted as to additions made subsequent to December 31, 1916, though we have made no finding in this respect, since counsel for the petitioner stated that the Commissioner had made satisfactory additions in this respect. All buildings originally constructed—some as early as 1895—were still in use at the date of the hearing in 1930. The greater part of the frame buildings were apparently tenements, and, while we have no evidence as to the exact dates when they were constructed, apparently some of them were erected during the early history of the corporation, and the evidence is that all were still in use in 1930, except a few that were burned. For 1920 and 1921 the Commissioner allowed deductions for depreciation based upon a 3 per cent rate for brick buildings and 4 per cent for those of frame construction and for 1922 and 1923, a rate of 3 per cent on old brick buildings, 5 per cent on frame buildings, and 2 per cent on new brick buildings. Aside from objections which might be made as to lack of evidence as to cost, March 1, 1913, value, or date of acquisition of individual buildings, it is difficult to see how the evidence can be said to justify an increase in the allowance made by the

Commissioner. Brick buildings constructed in 1895 would now be 35 years old whereas the rate allowed by the Commissioner is predicated on a life of 33⅓ years. A small part of the depreciation allowance on brick buildings for 1922 and 1923 was based upon a 2 per cent rate or 50-year life for new buildings, but we have no evidence upon which we can say that this allowance was inadequate. The allowances for frame construction are based upon a life of 25 and 20 years, and certainly the evidence would not justify disturbing even the lower rate, since apparently tenement buildings of an approximate age of 25 years are still in use.

And much that has been said about buildings applies with equal force to machinery. Instead of furnishing the cost of machinery that was acquired prior to December 31, 1916, or its March 1, 1913, value (when acquired prior to that date), with evidence as to definite life from date of acquirement or March 1, 1913, the petitioner takes the December 31, 1916, book value as fixed by the Commissioner, with additions since that time, and seeks to justify a greater allowance than that granted by the Commissioner mainly on the ground " that at the beginning of the year 1924 the taxpayer's plant as it existed in 1916 was exhausted, in so far as its useful life was concerned." But again, without taking into consideration many other objectionable features as to the very general and fragmentary evidence presented, we are far from satisfied that the useful life of the plant as it existed in 1916 was ended by January 1, 1924. Certainly, with only minor exceptions, there were no abandonments of machinery during that period; on the contrary, as late as 1929 some machinery acquired in 1896 or 1905 was still in use. Of course, it may well be that some use made of machinery from 1924 to 1929 was experimental in the sense that the petitioner was seeking to turn it into more profitable lines, but under such conditions it could hardly be said that its useful life was ended when it was being used in this way. Further, the sales of the petitioner for 1927 were the largest for any year since 1916 except 1921, which were only slightly larger. Of course, sales may not be the same as production in a given year, though the opinion of the bookkeeper was that production was " keeping pretty close up with orders in those years." It is also true that additions were made to the plant capacity in those years, but it certainly does not indicate that the production came alone from new machinery. On the contrary, the testimony was that both the old and new machinery have been operated part of the time since 1923.

The question of a reasonable rate of depreciation on cotton mill machinery has been before the Board on many occasions and we have found rates varying from 3½ to 7½ per cent. *Hampton Cotton Mills*, 2 B. T. A. 440; *Harmony Grove Mills*, 2 B. T. A. 1200; *Noko-*

*mis Cotton Mills*, 2 B. T. A. 1205; *Tifton Cotton Mills*, 11 B. T. A. 913; *Crown Manufacturing Co.*, 12 B. T. A. 37; and *Sanford Cotton Mills*, 14 B. T. A. 1210. In the case at bar the Commissioner allowed a rate of 5½ per cent for 1920 and 1921 and 7 per cent for 1922 and 1923. Witnesses for respondent, who testified as to cotton mill machinery in general, but who were unfamiliar with petitioner's plant, stated that in their opinion 3 per cent was a fair rate. The petitioner's superintendent, who was its chief witness as to the life of the machinery in question, was asked the following question and gave the following reply:

Q. What is the composite or average rate that should be used on the machinery of a cotton textile plant?

\*       \*       \*       \*       \*       \*       \*

A. My opinion would be formed on a general thing about what the general people believe. On the colored goods mill the real life of machinery, I mean by that when it is up and doing its work, it's certainly shorter than it is on a grey goods mill. In other words, say we are running denim mill, you allow a general average of 15 to 20 years, and then on a drill machine it ought to be a longer period of time. Does that answer your question?

Of course, the amount of depreciation allowable in a given case is a question of fact to be determined upon the particular facts surrounding the use of a given depreciable asset and what may be the life of a given class of assets under general conditions is not conclusive, but we certainly have no evidence of unusual conditions in this case which would justify an allowance greater than that allowed by the Commissioner.

*Judgment will be entered for the respondent.*